UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CODY HUNTER FUNDERBURK,<br><br>Plaintiff,<br><br>v.<br><br>VIRGINIA MASON MEDICAL CENTER doing business as BAILEY-BOUSHAY HOUSE; COMMONSPIRIT HEALTH doing business as VIRGINIA MASON FRANCISCAN HEALTH,<br><br>Defendants. | CASE NO. 2:25-cv-01495-JNW<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

## 1. INTRODUCTION

This matter comes before the Court on Defendants Virginia Mason Medical Center, d/b/a Bailey-Boushay House, and CommonSpirit Health, d/b/a Virginia Mason Franciscan Health's (together, "Bailey-Boushay") motion to dismiss, Dkt. No. 30, and motion for summary judgment, Dkt. No. 47. The Court has reviewed the motions, pro se Plaintiff Cody Funderburk's oppositions, Dkt. Nos. 42, 49, the replies, Dkt. Nos. 43, 50, and the rest of the record, and finds oral argument unnecessary. *See* LCR 7(b)(4).

Funderburk worked as a shelter technician at Bailey-Boushay House, a low-barrier shelter in Seattle for people living with HIV. Over about 18 months, shelter clients directed sexual comments, slurs, threats, and unwanted touching at Funderburk. Funderburk reported the incidents, took medical leave, and then made a zero-tolerance policy for client harassment a condition of going back to client-facing work. Bailey-Boushay declined. Funderburk spent six paid shifts in an empty office waiting for a different answer, was placed on administrative leave, and turned down the accommodation process Bailey-Boushay offered. This lawsuit followed.

No one should have to put up with what Funderburk describes, and nothing in this Order suggests otherwise. But summary judgment asks a narrower question—whether a reasonable jury could hold Bailey-Boushay liable on this record. It could not. The record shows an employer that acted on Funderburk's reports, gave them their job back after leave, and sent them home only after they declined to do it. Much of that showing comes from Funderburk's own words in the complaint, in emails, and under oath. So the Court GRANTS the motion for summary judgment and DENIES the motion to dismiss as moot.

## 2. BACKGROUND

The following facts are either not genuinely disputed or taken in the light most favorable to Funderburk as the nonmoving party.

**2.1 Clients harass Funderburk, and Bailey-Boushay responds.**

Bailey-Boushay House is a low-barrier homeless shelter that serves people with HIV/AIDS. Funderburk began working there as a shelter technician on November 5, 2021. Dkt. No. 47-1 (Funderburk Dep.) at 25:23–26:5. Funderburk identifies as a transfeminine nonbinary individual.[1] *Id.* at 60:10–11. Many of the shelter's clients struggle with mental illness and substance use, and—as Funderburk acknowledges—Bailey-Boushay "does not suspend or discharge as readily as other shelters or programs." *Id.* at 181:16–20.

From April 2023 through October 2024, Funderburk reported the following incidents[2] to Bailey-Boushay:

1. April 15–16, 2023: a client, P.H., "was observed masturbating in the community room" and continued to do so after Funderburk told him "you can't do that in here." Dkt. No. 49-4 at 2. Bailey-Boushay did not allow the client to return for two days. *See id.* Bailey-Boushay discussed the client in a meeting and agreed "[f]or public masturbation, there needs to be no reminders, but a direct suspension." *Id.* at 7. Funderburk told the team that earlier suspensions of this client were "not resolving" the behavior. *Id.* at 4.

2. April 16–17, 2023: a second client, T.R., asked Funderburk "what would it mean if I asked you out? Would that mean I want to be like your boyfriend or something?" Dkt. No. 49-5 at 2, and whether Funderburk wore "lipstick" and "bras," and said he "could see [Funderburk] in a bikini," *id.* at 3. Funderburk reported the incident. *Id.* at 2–3. A social worker stepped in, coached T.R. on professional

---

[1] This Order refers to Funderburk using they/them/theirs pronouns, as reflected in the Complaint. *See, e.g.*, Dkt. Nos. 1-1 at 2, 14; 5 at 4.

[2] Funderburk filed their EEOC charge on May 4, 2025. Dkt. No. 49-24 at 4. Incidents 1 through 4 occurred more than 300 days before that date. The Court still considers them under the continuing violation doctrine for hostile-work environment claims.; *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).

boundaries, and redirected him again when he said he'd "like to be with a trans person." *Id.* at 2.

3. July 3, 2023: T.R. called Funderburk "cutie" and asked if he could say "I love you." Rebuffed, he said, "I'm going to kill everybody," and mimed firing a gun. *Id.* at 5. A social worker coached him, and he left the room. *Id.* The behavioral team met that day, and after T.R. threatened another employee, he was removed until at least the next day. *Id.* at 4–5. Funderburk identifies no later conduct by T.R. directed at them.

4. May 26 and June 29, 2024: a client, Q.N., called Funderburk a "bitch," and security removed him for the day. Dkt. No. 47-1 at 73:21–77:23. Later that day, Q.N. spat on Funderburk off campus. *Id.* at 80:14–81:7. Bailey-Boushay barred Q.N. "until further notice," *id.* at 83:1–5, and then revoked his program, shelter, and nursing access, leaving him meal service at the door. *Id.* at 88:20–89:10, 90:1–4. A month later, Q.N. again called Funderburk a "bitch" outside the building. *Id.* at 90:14–25.

5. July 22, 2024: a client, B.B., called Funderburk "tranny," and later threw a wadded-up tissue or glove before leaving the program. Dkt. Nos. 1-1 at 4; 47-1 at 97:4–7. Funderburk had authority to ask him to leave but chose not to, given his mental-health struggles; they reported the incident and directed that he attend a care conference before returning. Dkt. Nos. 1-1 at 4; 47-1 at 98:14–99:1.

6. August 17, 2024: B.B. seemed to want "feminine-presenting" staff members to tie his shoes. Dkt. Nos. 1-1 at 5; 47-1 at 101:6–102:14.

7. October 14, 2024: B.B. made a comment about "Mexican[]" and "Hispanic[]" employees stealing his clothes. Dkt. Nos. 1-1 at 6; 47-1 at 103:15–104:25. Funderburk asked him to take a break from the program, and B.B. called them "the f-slur" and told them to "shut the fuck up." Dkt. Nos. 1-1 at 6; 47-1 at 105:9–15. Security and a Bailey-Boushay director asked him to leave, but indicated B.B. could return after 4:00 p.m. that same day. Dkt. Nos. 1-1 at 6; 47-1 at 106:2–12.

8. October 21, 2024: a client, I.M., grabbed Funderburk's hair, said "do you know anything about gold digging honey?" and reached for their hair again after being told to stop. Dkt. Nos. 1-1 at 7; 47-1 at 109:2–111:13. The Clinical Care Manager ("CCM") told I.M. that it is "100% unacceptable to make such comments or to make non-consensual contact with anyone at [Bailey-Boushay]," and that as soon as he

finished his meal, he would need to leave for the day. Dkt. No. 1-1 at 7. The CCM then checked in with Funderburk. *Id.* Funderburk saw the client still eating and left for the day. Dkt. No. 47-1 at 113:9–114:10. The client was required to have a care conference when he returned. Dkt. No. 1-1 at 7.

**2.2 Funderburk takes medical leave and conditions their return.**

On October 21, 2024, Funderburk asked Human Resources ("HR") for leave, citing "the emotional and mental toll" of "repeated incidents of sexual harassment by clients in the workplace." Dkt. No. 49-27 at 2. Bailey-Boushay approved 12 weeks of leave under the Family and Medical Leave Act ("FMLA"), through January 24, 2025. Dkt. No. 49-1 ¶ 5.

While on leave, Funderburk sent their supervisor, Director of Outpatient Programs Katie Hara, three proposals: (1) a mandatory one-week ban for any client who sexually harassed a staff member, "regardless of their health, housing, or medication needs," with permanent discharge for a second offense; (2) a sign announcing the policy; and (3) a change to Funderburk's own role "to include more administrative work and reduce [their] exposure to the milieu setting." Dkt. Nos. 47-1 at 100; 49-28 at 2. The milieu is the shelter's common room, where shelter technicians are stationed with clients. Dkt. No. 47-1 at 47:3–14; *see also id.* at 116:3–7.

Hara took the proposals to leadership and HR, telling an HR colleague, "Are we obligated to support this request? I would rather not though." Dkt. No. 49-7 at 2. On January 24, 2025, she told Funderburk that Bailey-Boushay would not adopt the ban or the sign, pointing to the "competing interests" of the clients, "including the prevalence of mental health disorders among the Bailey-Boushay House

population and the low-barrier nature of the shelter." Dkt. No. 1-1 at 35; *see also* Dkt. No. 47-1 at 179:11–19, 110. On the third proposal, she pointed Funderburk to an open administrative-assistant position. Dkt. Nos. 49-1 ¶ 8; 47-2 (Hara Dep.) at 64:18–25. Funderburk interviewed with Hara and Andrew Kim, *id.* at 65:1–5, the finance manager who had been screening candidates since December. *See* Dkt. No. 49-8 at 2–3. Hara left the decision to Kim. Dkt. No. 47-2 at 65:17–22. On February 1, Funderburk learned they had not been selected. Dkt. No. 49-1 ¶ 11.

Meanwhile, Funderburk's leave had ended. Hara agreed that Funderburk could return as of January 24 but, through what she calls "an oversight," never added them to the schedule. Dkt. No. 47-2 at 60:17–61:17. Funderburk came in anyway on January 25 and kept to their usual Saturday-through-Monday schedule. Dkt. No. 47-1 at 182:17–183:18. But they did not go back to the milieu. As the complaint puts it, Funderburk was "prepared to resume work duties contingent upon the implementation of reasonable safety accom[m]odations previously proposed to management." Dkt. No. 5 at 5. So for six shifts, Funderburk "set up" in an "empty administrative office . . . while awaiting a response from [Bailey-Boushay] regarding [their] return-to-work plan," catching up on trainings and emailing HR. Dkt. Nos. 1-2 at 9; 47-1 at 184:12–185:6. An attorney, Funderburk testified, had "advised me to not return to the milieu setting or interact with clients . . . until the hostile work environment claim had been addressed." Dkt. No. 47-1 at 204:13–20. Bailey-Boushay paid Funderburk for all six shifts. *Id.* at 210:3–6, 212:2–6.

### 2.3 Bailey-Boushay places Funderburk on leave and offers an accommodation process.

On Saturday, February 1, Funderburk emailed HR, copying Hara and the Executive Director, to contest the rejection of their proposals. The decision, Funderburk wrote, "suggests that participation in programming is contingent on staff enduring harassment." Dkt. No. 49-32 at 2. The next day, Funderburk filed a retaliation complaint with the Washington State Department of Labor & Industries ("L&I"). Dkt. No. 1-1 at 14–16.

On Monday, February 3, Funderburk again set up in the administrative area with a personal laptop. Hara wrote to HR manager Karin Edenholm, "Because they are unwilling to complete the duties of their current job description they are sitting in the back admin area with their personal laptop filing complaints with OSHA and L&I." Dkt. No. 49-33 at 2. In a chat exchange, Hara added that Funderburk was "refusing to do their job without accommodation" and asked whether they had "a right to be onsite[.]" Dkt. No. 49-10 at 2. Edenholm answered, "If Cody is not working, they should not be onsite." *Id.* She then proposed telling Funderburk they were on paid administrative leave until "[t]he accommodation request is sorted out," and Hara agreed. *Id.* at 4. Funderburk left the building that day. *Id.* at 5.

Two days later, Edenholm confirmed in writing that Funderburk was "on paid administrative leave while we work out the process for you returning to work." Dkt. No. 49-21 at 2. If Funderburk was requesting accommodation for a disability, she wrote, they would need to complete the attached forms; if the requests reflected "preferences," she, Hara, and Funderburk could schedule a discussion. *Id.* She later

added that "[i]n general, when an employee returns from leave with restrictions and a request for accommodation, they aren't returned to their position until we have gone through the interactive process." *Id.* at 4.

Funderburk never returned the forms. On February 6, they wrote that "this is primarily a workplace safety issue, and that the 'disability' in question stems directly from the hostile work environment." *Id.* at 2. On March 10, they wrote, "I want to clarify that my concerns are not a disability accommodation request but rather a workplace safety issue that affects all employees." Dkt. No. 49-11 at 2 (citation modified). Edenholm then proposed a meeting to further discuss Funderburk's proposals—"hopefully we can find ways to make sure you feel safe at work"—and offered times. Dkt. No. 47-3 at 4–5. Funderburk accepted one, then asked to wait for the Equal Employment Opportunity Commission (EEOC), and on May 7 asked to "pause any further internal meetings[.]" *Id.* at 2–4. Funderburk was not paid during the leave. Dkt. No. 49-1 ¶ 14.

Funderburk filed an EEOC charge on May 4, 2025, received a right-to-sue notice 10 days later, and sued on August 8. Dkt. Nos. 1; 1-2 at 23–25, 28–31. The operative amended complaint followed a week later. Dkt. No. 5. In October 2025, after Funderburk declined to attend a meeting with HR, Bailey-Boushay ended their employment. Dkt. Nos. 49-12 at 2–3; 49-13 at 2; 47-1 at 26:1–5. Bailey-Boushay moved to dismiss, Dkt. No. 30, and after discovery, for summary judgment, Dkt. No. 47.

## 3. LEGAL STANDARD

"[S]ummary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020) (citation modified). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, courts must view the evidence "in the light most favorable to the non-moving party." *Barnes v. Chase Home Fin., LLC*, 934 F.3d 901, 906 (9th Cir. 2019) (citation modified).

In an employment discrimination case, the plaintiff "need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because 'the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record.'" *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996)). But even this forgiving standard does not excuse a "complete failure of proof concerning an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The nonmoving party may not rely on the mere allegations in the pleadings to show a "genuine issue for trial," but must instead "set forth specific facts[.]" *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005) (quoting *Liberty Lobby*, 477 U.S. at 256).

# 4. DISCUSSION

## 4.1 Bailey-Boushay is entitled to summary judgment on Funderburk's hostile-work environment claim.

Title VII of the Civil Rights Act of 1964 and the Washington Law Against Discrimination (WLAD) prohibit employment discrimination on the basis of sex, including hostile-work environments. To prevail, Funderburk must show that (1) they were "subjected to a hostile work environment," and that (2) Bailey-Boushay is "liable for the harassment that caused the hostile work environment to exist." *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 647 (9th Cir. 2021). The Ninth Circuit treats Title VII and WLAD claims of this kind as functionally identical, and the Court does the same. *See Christian v. Umpqua Bank*, 984 F.3d 801, 809 n.7, 811 n.10 (9th Cir. 2020).

### 4.1.1 The Court assumes a jury could find the harassment severe or pervasive.

To establish that they were subjected to a hostile work environment, Funderburk must show that: "(1) [they were] subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Fried*, 18 F.4th at 647. "The working environment must both subjectively and objectively be perceived as abusive." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 799 n.6 (9th Cir. 2003). To determine whether a work environment is abusive, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 687 (9th Cir. 2017) (citation modified).

Bailey-Boushay argues that the clients' conduct was not "because of sex" and, given the setting, was not severe or pervasive. Dkt. No. 47 at 17–22. The Court is skeptical. Funderburk describes sexual propositions, slurs, a death threat, spitting, and hair-grabbing over about 18 months, and courts must weigh such incidents together, not one at a time. *Christian*, 984 F.3d at 809–10. And "[w]hen severity is questionable, it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment." *Fried*, 18 F.4th at 648 (citation modified). Nor does the Court accept Bailey-Boushay's suggestion that absorbing such conduct is simply part of a shelter technician's job. *See* Dkt. No. 47 at 20–22; *cf. Freitag v. Ayers*, 468 F.3d 528, 540 (9th Cir. 2006) ("[C]ontemplating some difficulties is a far cry from *welcoming* a constant barrage of sexual abuse[.]"). But the Court need not decide the point. Even assuming a jury could find a hostile work environment, Funderburk's claim fails at the second step.

#### 4.1.2 No reasonable jury could find that Bailey-Boushay ratified or acquiesced in the harassment.

An employer is liable for harassment by a non-employee only when it "either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Christian*, 984 F.3d at 811 (citation modified). The employer's response "must be reasonably calculated to end the harassment," and its reasonableness "will depend on . . . the employer's

ability to stop the harassment and the promptness of the response." *Id.* at 811–12 (citation modified). Effectiveness is measured "not only by ending the current harassment but also by deterring future harassment—by the same offender or others. If 1) no remedy is undertaken, or 2) the remedy attempted is ineffectual, liability will attach." *Id.* at 812 (citation modified).

The cases finding a triable question of employer liability share a feature: the employer knew and did nothing, or made things worse. In *Christian*, a manager promised to bar a customer who was stalking a bank employee, never did, and later told her to "hide in the break room." *Id.* at 806–08, 812–13. In *Little v. Windermere Relocation, Inc.*, an employee who reported that a client had raped her was told to put it behind her, was never investigated, and was demoted and fired when the report reached the company's president; there, the employer's response "reinforced rather than remediated the harassment." 301 F.3d 958, 964–65, 967–69 (9th Cir. 2002). In *Freitag*, a supervisor told a correctional officer not to document an inmate's exhibitionism, and a lieutenant discarded her disciplinary report because "it's only sex." 468 F.3d at 533–34. And in *Fried*, a manager answered a manicurist's report that a customer had propositioned him by telling him to "just go finish the pedicure and get it over with." 18 F.4th at 646, 652 (citation modified). By contrast, an employer's "prompt corrective response can insulate [it] from liability." *Id.* at 650.

This record looks nothing like those cases. When Funderburk reported harassment, Bailey-Boushay acted against the client, almost always the same day. It suspended P.H., the client who masturbated in the community room. A social

worker stepped in on the spot with T.R., and after T.R.'s threats, the team removed him. Security removed Q.N.; and after he spat on Funderburk, Bailey-Boushay barred him and then revoked his access. Security and a director sent away B.B., the client who used transphobic and homophobic slurs. And a manager told I.M., the client who grabbed Funderburk's hair, that his conduct was "100% unacceptable," sent him off for the day, and required a care conference before his return. *See supra* § 2.1. No supervisor brushed off a report, told Funderburk to keep serving a harasser, or penalized them for complaining.

Funderburk responds that Bailey-Boushay should have imposed mandatory bans like those they proposed. Dkt. No. 49 at 18–19. Bailey-Boushay answers that its mission and clientele make such bans unworkable. Dkt. No. 47 at 19–22. A difficult setting does not lower an employer's duty. *Freitag* rejected that argument in perhaps the harshest setting there is, holding that "even in an inherently dangerous working environment, the focus remains on whether the employer took reasonable measures to make the workplace as safe as possible." 468 F.3d at 539. But the same case makes the employer's ability to stop the harassment part of the inquiry, *id.* at 539–40, and here the clientele bears on that ability. Many of Bailey-Boushay's clients are seriously mentally ill, and many rely on the shelter to manage their HIV medication. *See* Dkt. Nos. 47-1 at 181:5–20; 47-2 at 77:7–78:11. So the shelter weighs each client's circumstances in deciding how long a removal should last. Funderburk did the same in July 2024, when they chose not to remove a client who had used a slur because he was "clearly struggling with a variety of different mental health issues." Dkt. No. 47-1 at 98:14–99:1. The Court does not cite that

choice to fault Funderburk since a victim's actions do not excuse an employer. *See Christian*, 984 F.3d at 812–13. The point is that case-by-case judgment was the norm at this shelter, and "'[r]emedial measures do not fail to be reasonably calculated to minimize such harassment and protect the safety of its employees' simply because they fall short of victim's expectations." *Luna v. Cal. Dep't of Corr. & Rehab.*, No. 20-CV-08097-EMC, 2022 WL 1271008, at *11 (N.D. Cal. Apr. 28, 2022) (quoting *Freitag*, 468 F.3d at 541), *aff'd*, No. 22-15769, 2024 WL 1736350 (9th Cir. Apr. 23, 2024).

Funderburk's strongest point is that the harassment kept coming, and *Christian* measures a remedy partly by whether it deters "the same offender or others." 984 F.3d at 812. But the harassment came from different clients, many of them acutely ill, and a sanction imposed on one such client cannot be expected to deter the next. As for the "same offender," with one exception, Funderburk identifies no client who, once removed for harassing them, did it again inside the shelter. The exception is the client who masturbated in the community room—and there, leadership answered the repeated conduct by doing away with warnings in favor of "direct suspension." Dkt. No. 49-4 at 7. Recurrence across different clients, in a setting like this one, does not by itself show that Bailey-Boushay's remedies were "ineffectual." In *Christian*, the remedy was ineffectual because the same customer, never told to stay away, kept coming back. *See* 984 F.3d at 812–13.

Funderburk also argues that Bailey-Boushay ratified the harassment by departing from the Workplace Violence Prevention Plan, which calls for reports to security and documentation of violent incidents. Dkt. No. 49 at 18–19. The parties

dispute whether the plan governs Bailey-Boushay. *Compare* Dkt. No. 49-18 at 147:7–148:11, *with* Dkt. No. 49-21 at 5–6. *See also* Dkt. No. 49-3 at 2. For purposes of this motion, the Court assumes it does. Even so, the question is not whether the employer followed each step of its own policy but whether its response was reasonably calculated to end the harassment. And the incidents here were documented, with security involved when clients had to be removed. That HR cannot point to a separate threat-assessment review does not turn a prompt response into acquiescence.

Finally, Funderburk notes that Bailey-Boushay once permanently suspended a client for sexual predation. Dkt. No. 49 at 19. That shows a lasting ban was available in a serious case. It does not show that anything short of a lasting ban is unreasonable. The same goes for the client who was allowed to finish his meal before leaving. A jury might think immediate removal the better course. *See Fried*, 18 F.4th at 652. But the manager confronted the client at once, no one directed Funderburk to stay near him, and Funderburk was free to leave and did. Title VII asks for a reasonable response, not the best one. On this record, no reasonable jury could find that Bailey-Boushay ratified or acquiesced in the clients' conduct.

### 4.2 Bailey-Boushay is entitled to summary judgment on Funderburk's disparate treatment claim.

The *McDonnell Douglas* framework applies in disparate treatment cases. Under this test, the plaintiff must first show "(1) [they] belon[g] to a protected class, (2) [they were] performing according to [their] employer's legitimate expectations, (3) [they] suffered an adverse employment action, and (4) similarly situated

employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Reynaga*, 847 F.3d at 690–91; *see Cornwell v. Microsoft Corp.*, 430 P.3d 229, 234 (Wash. 2018) ("When evaluating the merits of cases brought under the WLAD, we employ the *McDonnell Douglas* [framework].").

Bailey-Boushay concedes the first element and takes no position on the second. Dkt. No. 47 at 23–24. It reads the claim as resting on a single email—the Executive Director's February 2025 message to staff about assaults on two male employees—and argues that an email is not an adverse employment action. *Id.* But that is not the claim Funderburk presses. Funderburk says the adverse actions are their "removal, non-reinstatement, non-payment, and termination," and that the different response to the men's assaults shows the motive behind them. Dkt. No. 49 at 19. The Court takes the claim as Funderburk frames it and assumes those actions are adverse. *See Muldrow v. City of St. Louis, Missouri,* 601 U.S. 346, 347 (2024) ("To make out a Title VII discrimination claim, [an employee] must show some harm respecting an identifiable term or condition of employment.").

The claim fails at the fourth element, because nothing in the record connects those actions to Funderburk's sex. Start with the comparators. To be "similarly situated" means being "similarly situated in all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006); *see also Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) ("[I]ndividuals are similarly situated when they have similar jobs[.]"). The two men were a charge nurse and a housekeeper who worked in other programs. Dkt. No. 49-19 at 90:15–25. Nothing suggests that either

declined to do his job and was kept on anyway, or was placed on leave and paid. So they say nothing about whether Bailey-Boushay treated Funderburk worse, because of sex, in the actions Funderburk challenges.

What the comparison does show is a difference in how leadership communicated after an assault. The men's assaults drew a campus-wide email and personal follow-up from the Executive Director; Funderburk's reports did not. Dkt. No. 49-22 at 2. Hara gave an explanation that Funderburk does not rebut: the men worked in different departments, so the message went campus-wide; reports about Funderburk went to the outpatient team, where Funderburk worked; and the same review of the client's behavior followed in each case. That Hara answered "I'm not sure" when asked for a "legitimate non-discriminatory reason," Dkt. No. 49-18 at 95:14–96:20, shows a lay witness's uncertainty about a legal label, not that sex drove anything.

If Funderburk's claim rests instead on the theory that Bailey-Boushay met their harassment reports with "indifference," Dkt. No. 5 at 5, it fails for the reasons already given. *See supra* § 4.1.2.

### 4.3 Bailey-Boushay is entitled to summary judgment on the FMLA interference claim.

"[T]he FMLA creates two interrelated, substantive employee rights: first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave." *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011) (quoting *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001)). An

employer that fails to restore a returning employee interferes with those rights, whatever its intent. *Id.* at 778. To prevail on an interference claim, the employee must show, among other things, that "his employer denied him FMLA benefits to which he was entitled." *Id.* (citation modified). If the employer claims a legitimate reason for denying reinstatement, the employer bears the burden of proving it. *Id.* at 780.

Whether Bailey-Boushay denied Funderburk the restoration the FMLA guarantees is the only element in dispute. It did not. When Funderburk's leave ended, their job was waiting—the same title, duties, location, and supervisor. Dkt. No. 49-20 at 5. Funderburk came back on January 25, kept their usual schedule, clocked in, and was paid for six shifts.

Funderburk responds that Hara never put them on the schedule or assigned them duties. Dkt. Nos. 49 at 16–17; 49-1 ¶ 9. That is true. Dkt. No. 47-2 at 60:17–61:17. But the lapse cost Funderburk nothing, and the reason no one handed them assignments is undisputed, because it comes from Funderburk. They returned "prepared to resume work duties contingent upon" changes Bailey-Boushay had declined to make, and they spent their shifts in an empty office—outside the milieu, where a shelter technician works—waiting for a different answer. *See supra* § 2.2.

What Funderburk wanted on return was a different job with more administrative work, less time with clients, and new shelter-wide policies. The FMLA does not provide that. It "does not entitle the employee to any rights, benefits, or positions they would not have been entitled to had they not taken leave." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003) (citing 29

U.S.C. § 2614(a)(3)(B)). Because intent is irrelevant, Hara's "oversight" would be no defense had it cost Funderburk their job. Dkt. No. 49 at 17. It did not. Funderburk was not denied their job; they simply declined to do it.

Nor does Edenholm's later remark—that employees who return with accommodation requests "aren't returned to their position" until the interactive process is complete—change the analysis. Dkt. No. 49-21 at 4. She was describing the February 3 leave, which came after six shifts back and which the Court addresses below. And if that leave were a denial of reinstatement that Bailey-Boushay must justify, *Sanders*, 657 F.3d at 779–80, Funderburk's own account supplies the justification.

Funderburk's complaint also suggests that Bailey-Boushay held the leave against them. Dkt. No. 5 at 5. That is an interference theory too, and it requires proof that "taking of FMLA-protected leave constituted a negative factor in the decision." *Bachelder*, 259 F.3d at 1125. There is none. Bailey-Boushay granted all 12 weeks, and nothing suggests the leave itself—rather than the conditions Funderburk set on coming back—played any part in what followed. On either theory, no reasonable jury could find that Bailey-Boushay interfered with Funderburk's FMLA rights.

### 4.4 Bailey-Boushay is entitled to summary judgment on the ADA claim.

To state a claim of discrimination under the ADA, Funderburk must show that (1) they are disabled within the meaning of the ADA; (2) that they are a qualified individual with a disability; and (3) that they suffered an adverse

employment decision because of their disability. *Nunes v. Wal-Mart Stores, Inc.,* 164 F.3d 1243, 1246 (9th Cir. 1999). Discrimination under the ADA includes failing to reasonably accommodate a qualified employee's disability. *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018). Funderburk's ADA claim has taken more than one form. The complaint alleges that Bailey-Boushay failed to accommodate their anxiety, Dkt. No. 5 at 4—and, in the same paragraph, faults Bailey-Boushay for steering "a workplace safety issue" into "a disability accommodation process," *id.* at 5. The Court takes the claim as Funderburk now presents it: Bailey-Boushay knew of the disability by October 2024, and the duty to engage in an interactive process arose then. Bailey-Boushay never engaged. That, Funderburk argues, shifts the burden to Bailey-Boushay to prove that no reasonable accommodation was available. And it cannot carry that burden, because a vacant administrative position would have kept Funderburk out of the milieu. Dkt. No. 49 at 20–22.

The law supports the first two steps in part. "[N]otifying an employer of a need for an accommodation triggers a duty to engage in an 'interactive process,'" and an employer that fails to engage in good faith bears the burden at summary judgment of proving that no reasonable accommodation was possible. *Snapp*, 889 F.3d at 1095. But the process is a means to an accommodation, not a claim in itself, *id.*, and "[l]iability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown" in that process, *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (citation modified). Absent that, the employee must identify "specific reasonable

accommodations that the employer failed to provide." *Id.* at 1088. The Court assumes that Funderburk's anxiety is a disability and that they were qualified.[3] The claim fails because Funderburk, not Bailey-Boushay, ended the interactive process, and because the one accommodation Funderburk identifies is not one the ADA required.

Start with the months before February 5, 2025. Funderburk's leave request cited an "emotional and mental toll," Dkt. No. 49-27 at 2; their proposals were framed as measures "to support a workplace free from sexual harassment," Dkt. No. 49-28 at 2; and their February 1 complaint that "no accommodations have been granted" mentioned no medical condition, Dkt. No. 47-1 at 191:8–25. Nothing told Bailey-Boushay that a disability was in play. Even so, Hara took the proposals to leadership and HR, explained why the shelter would not adopt a fixed ban, and on the one proposal personal to Funderburk, pointed them to an open administrative position for which they interviewed. *See supra* § 2.2.

Then, on February 5, Edenholm sent Funderburk the paperwork to "request accommodation for a disability," explaining that "[w]e need to know what restrictions you have based on your health condition, and after that we can engage in the interactive process." Dkt. No. 49-21 at 2. A month later she asked whether Funderburk planned to submit the forms. Dkt. No. 49-11 at 3. Funderburk answered that they were waiting on answers to other questions before

[3] Bailey-Boushay also argues that Funderburk failed to exhaust the ADA claim. Dkt. No. 47 at 28. Because the claim fails on the merits, the Court does not reach that argument.

"proceed[ing]"—and then, in the same email, that their concerns were "not a disability accommodation request" and their proposals were "not to address an individual medical need." *Id.* at 2. When Edenholm offered to meet instead, Funderburk insisted that their concerns were "not about a personal disability" and must "not be reframed as a disability accommodation." Dkt. No. 47-3 at 4. They later testified that they thought the forms unlawful but never told Edenholm so. Dkt. No. 47-1 at 215:21–216:10.

Funderburk calls this "conditional engagement, not refusal," and points to their February 6 email tying the "'disability' in question" to their doctor's notes. Dkt. Nos. 49 at 22; 49-21 at 2. But an employer cannot be faulted for failing to accommodate a disability that the employee repeatedly insists is not at issue. Whatever the February 6 email left open, Funderburk closed in March. The process broke down because Funderburk would not take part in it, so the burden does not shift. *Zivkovic*, 302 F.3d at 1089; *Snapp*, 889 F.3d at 1095.

That leaves the administrative position. Dkt. No. 49 at 21–22. An "employer is not obligated to provide an employee the accommodation [they] request[ ] or prefer[ ], the employer need only provide some reasonable accommodation." *Zivkovic*, 302 F.3d at 1089 (citation modified). Bailey-Boushay offered a route back to the shelter-technician job through the interactive process, with a meeting on all three of Funderburk's proposals, and Funderburk declined it. Funderburk's objection that Bailey-Boushay rejected their proposals without offering an alternative, Dkt. No. 49 at 21, mistakes what the ADA requires. The employer must explore accommodations with the employee in good faith, *Zivkovic*, 302 F.3d at

1089; it need not settle on one before the employee will describe the limitation. Nor did Bailey-Boushay withhold the position. Funderburk applied and interviewed, and Kim chose someone else, and nothing in the record suggests that a condition Funderburk had not disclosed played any part in that choice.

Funderburk's opposition adds a new theory: that the forms themselves were an unlawful medical inquiry under 42 U.S.C. § 12112(d)(4)(A). Dkt. No. 49 at 22–23. No such claim appears in the complaint, and Funderburk never sought to add one before discovery closed. "A complaint may not be amended by the briefs in opposition" to a dispositive motion. *Cole v. Amazon.com Servs. LLC*, 765 F. Supp. 3d 1154, 1160 (W.D. Wash. 2025) (citation modified).

### 4.5 Bailey-Boushay is entitled to summary judgment on Funderburk's retaliation claims.

Funderburk claims retaliation under the Washington Industrial Safety and Health Act ("WISHA"), the FMLA, Title VII, and the WLAD. Dkt. Nos. 5 at 5; 49 at 11. They identify four protected acts: internal reports of client sexual harassment; FMLA leave; requests for accommodation; and the L&I complaint, which they say opposed the same harassment. Dkt. No. 49 at 11–12. And they challenge three actions: the February 3 removal and unpaid leave, the denial of the administrative position, and the October 2025 termination. *Id.* at 12–16.

#### 4.5.1 The WISHA claim is time-barred, and the FMLA theory is an interference claim.

WISHA allows an employee to institute an action "on his or her own behalf within 30 days of" a letter of closure from the agency. RCW 49.17.160(5).

Funderburk received the closing letter on February 6, 2025, and sued six months later. Dkt. Nos. 47-1 at 258:7–17; 1 at 1. Funderburk does not argue otherwise; they say only that the time bar does not reach their other statutes. Dkt. No. 49 at 11. The WISHA claim is time-barred. *See Morrison v. Kroger Co.*, 453 F. App'x 726, 726 (9th Cir. 2011) (finding "[t]he district court properly granted summary judgment on [plaintiff's] retaliation claim under [WISHA] because" it "requir[es] plaintiff to file action within 30 days of a Department of Labor and Industries determination that there was no statutory violation").

Nor can Funderburk bring an FMLA retaliation claim for having taken leave. The FMLA's anti-retaliation provisions protect employees who oppose practices the Act makes unlawful or who take part in FMLA proceedings. 29 U.S.C. § 2615(a)(2), (b). Those provisions "do not cover visiting negative consequences on an employee simply because he has used FMLA leave. Such action is, instead, covered under § 2615(a)(1)," the interference provision. *Bachelder*, 259 F.3d at 1124. The Court has already addressed that theory. *See supra* § 4.3.

#### 4.5.2 No reasonable jury could find that the February 3 leave was retaliatory.

To establish retaliation under Title VII and the WLAD, Funderburk must show (1) they participated in a protected activity; (2) they suffered an adverse employment action; and (3) a causal link exists between the two. *Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007) (Title VII); *Tyner v. State*, 154 P.3d 920, 928 (Wash. Ct. App. 2007) (WLAD). The *McDonnell Douglas* framework applies. *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011); *Cornwell*, 430 P.3d at 234.

The Court assumes Funderburk can make a prima facie case. Opposing sexual harassment is protected activity, and Funderburk did that, most recently in the February 1 email to HR, which Hara forwarded to Edenholm the morning of February 3. The leave followed within hours, and at this stage, causation "can be inferred from . . . the proximity in time between the protected activity and the adverse action." *Dawson*, 630 F.3d at 936.

The burden thus shifts to Bailey-Boushay "to offer evidence that the challenged action was taken for legitimate, non-discriminatory reasons." *Id*. It has done so. For six shifts, Funderburk clocked in and then waited in an empty office for Bailey-Boushay to adopt their proposals rather than return to the milieu. *See supra* §§ 2.2, 4.3. On the sixth shift, with the administrative job gone, Hara asked HR what to do, and Edenholm, who made the decision, answered at the time: "If Cody is not working, they should not be onsite." Dkt. No. 49-10 at 2. She told Funderburk the same two days later. Dkt. No. 49-21 at 2. Bailey-Boushay's briefs call this "insubordination," Dkt. No. 47 at 25–26, and Funderburk objects to the label, Dkt. No. 49 at 13. The Court does not rely on it and assumes Funderburk was quiet and polite throughout. The reason for the leave was that Funderburk would not do the job until their conditions were met, and an employer may send such an employee home while the two sides work things out.

So Funderburk must show that this explanation "is merely a pretext," either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Dawson*, 630 F.3d at 935–36 (quoting *Davis v.*

*Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)). Direct evidence of motive need be "very little"; circumstantial evidence must be "specific" and "substantial." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221–22 (9th Cir. 1998). Funderburk offers eight arguments for pretext. Dkt. No. 49 at 13–16. They fall into four groups: the February 3 messages and their timing; the claim that Funderburk could not have refused work; the state of the contemporaneous record; and evidence of animus. None creates a triable issue.

Funderburk's lead argument is that Hara's February 3 email "names [their] protected regulatory complaints inside the removal decision itself," and that this is direct evidence of retaliation. Dkt. No. 49 at 11. It is not. Direct evidence "proves the fact of discriminatory animus without inference or presumption." *Godwin*, 150 F.3d at 1221 (citation modified). Hara's message reports only that Funderburk was not doing their job, and that they were filing complaints. To find retaliation, a factfinder would have to infer that Edenholm acted on the complaints rather than on the fact that Funderburk was not working. So the email is circumstantial evidence, to be read with the timing. Funderburk is right that "[i]n some cases, temporal proximity can by itself" show pretext. *Dawson*, 630 F.3d at 937. *Dawson* was such a case: the employee was fired two days after complaining to HR about anti-gay slurs, and he disputed the stated reason, a missed shift he said he had called in. *Id.* at 933–34, 937. Proximity matters most when it suggests the employer's reason was invented after the fact. Funderburk does not deny that they were not working; they say so themselves, in the complaint and under oath. *See supra* § 2.2. The Court does not decide what Edenholm was thinking. It holds only

that, on a record in which Funderburk had been opposing harassment in writing since October 2024 while Bailey-Boushay granted leave, met with them, and paid them for six shifts of waiting, the email and its timing do not by themselves show pretext.

Funderburk next argues that "[o]ne cannot refuse work one was never given," so the absence of a schedule or assignments means there was no refusal. Dkt. No. 49 at 4. That does not follow by Funderburk's own account; they would not return to the milieu until Bailey-Boushay met their conditions. *See supra* § 4.3. The same answer disposes of the points that Funderburk sat quietly on February 3 and had earned strong performance reviews. Dkt. No. 49 at 13, 15. Neither point reaches the reason Edenholm gave. An employee's demeanor and past reviews bear on discipline, and the leave was not discipline.

Funderburk also argues that "insubordination" appears in no contemporaneous document, that no one warned them of misconduct, and that Bailey-Boushay's explanations have shifted. *Id.* at 13–15. The premise is wrong, as the February 3 chat exchange is contemporaneous, and it states the reason. Edenholm's other formulations—that the leave would last until "[t]he accommodation request is sorted out," Dkt. No. 49-10 at 4, and that employees who return with accommodation requests "aren't returned to their position" until the interactive process is done, Dkt. No. 49-21 at 4—describe the leave going forward, not what happened before. By February 3, Funderburk had been back in their position for six shifts and had declined to perform it except on terms they set. *See supra* §§ 2.2, 4.4. Once Funderburk made their return depend on accommodations,

Bailey-Boushay would not put them back in the milieu until that question was resolved. Dkt. Nos. 49-10 at 4; 49-21 at 4. That is why leave continued. It is not a different account of why it began, and Edenholm's statements are not "inconsistent in material ways" with the reason Bailey-Boushay gives now. *Godwin*, 150 F.3d at 1222.

The other alleged gaps Funderburk identifies in the record do not change this. Edenholm could identify no document warning Funderburk of "misconduct," Dkt. No. 49-19 at 61:21–62:4, but the leave was not disciplinary in nature. And that HR officials who had no part in the decision could not explain it months later proves nothing when the person who imposed the leave explained it in writing at the time. *Id.*; *see also* Dkt. No. 49-18 at 62:24–63:23.

That leaves the alleged evidence of animus—Hara's "I would rather not though" email, Dkt. No. 49-7 at 2, and two emails from Assistant Director Sandy Eastwood, "Oh good grief.........of course!!!!" in January 2025, Dkt. No. 49-16 at 2, and "Oh good grief, get a life" on March 31, 2025. Dkt. No. 49-15 at 2. Hara's remark was about the policy proposal, not the person proposing it. And Eastwood's remarks were unkind, but she had no role in the leave decision, and her sharper comment came two months after it. Remarks "not tied directly to" the challenged decision do not show pretext. *Godwin*, 150 F.3d at 1221 (citation modified). Hara, unlike Eastwood, took part in the decision, since Edenholm asked whether she agreed before telling Funderburk about the leave. Dkt. No. 49-10 at 4. But her messages give the same reason—Funderburk was "refusing to do their job without accommodation"—and Funderburk does not dispute the fact behind it. *Id.* at 2. An

inference of animus has to rest on something more than a supervisor's accurate report of what the employee was doing. Nor does what followed suggest animus. Bailey-Boushay kept the job open for eight months while Edenholm pressed Funderburk to return through the accommodation process. *See* Dkt. Nos. 49-11 at 3; 47-3 at 2–5. No reasonable jury could find that Funderburk's complaints, rather than their refusal to work, lay behind the leave.

The result is the same under the WLAD. Funderburk notes that Washington courts view summary judgment for employers with caution and ask only whether retaliation was a "substantial factor" in the decision. Dkt. No. 49 at 5 (citing *Scrivener v. Clark Coll.*, 334 P.3d 541, 546 (Wash. 2014)). The Court applies that standard. But a jury still needs evidence from which to find that factor at work, and this record does not supply it.

**4.5.3 The administrative-assistant decision does not support a retaliation claim.**

Funderburk also contends that the denial of the administrative-assistant job was retaliatory, and that Hara's acknowledged concern about bias makes this a "cat's paw" case. Dkt. No. 49 at 15–16 (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 419–22 (2011); *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007)). That theory requires evidence that retaliatory animus traveled through a biased supervisor to the adverse employment decision, notwithstanding that that supervisor did not make the ultimate employment decision. *Staub,* 562 U.S. at 418–19. This record has no such evidence.

Kim made the hiring decision for the administrative-assistant position. He had been screening outside candidates since mid-December, before Funderburk applied. Dkt. No. 49-8 at 2–3. Funderburk offers no evidence that Kim knew of any protected activity, or of anything Hara said or did to steer him. Hara helped conduct the interview, so she was part of the process. But her testimony that she withdrew from the decision because recent interactions with Funderburk "might bias" her cuts against Funderburk's theory—it shows a supervisor taking herself out of a decision, not putting a thumb on the scale. Dkt. No. 49-18 at 66:1–11. Funderburk notes that they were well qualified and that Bailey-Boushay kept no interview notes or written rationale. Dkt. No. 49 at 15–16. But missing paperwork does not show that Kim's choice had anything to do with Funderburk's complaints.

#### 4.5.4 The October 2025 termination is not properly before the Court.

Funderburk argues, finally, that their October 2025 termination was retaliatory. Dkt. No. 49 at 13–14. But Funderburk signed the operative complaint on August 12, 2025—two months before the termination. Dkt. No. 5 at 8. The complaint checks a box for "[t]ermination of my employment," *id.* at 4, yet the facts it pled end with Funderburk still "classified as an active employee," *id.* at 5. The box cannot refer to an event that had not happened. Funderburk never sought to supplement the complaint, and a complaint may not be amended by a brief opposing a dispositive motion. *Cole*, 765 F. Supp. 3d at 1160.

Even if the termination were before the Court, the claim would fail on this record. By October 2025, Funderburk had not worked in eight months and had

asked to pause return-to-work discussions. Dkt. No. 47-3 at 2. HR told them in advance, in writing, that it would treat a refusal to meet as a resignation, and Funderburk declined to meet. Dkt. Nos. 49-12 at 2–3; 49-13 at 2. Funderburk disputes the "resignation" label—they said plainly that they were not resigning. *Id.* But whatever the separation is called, nothing suggests that its stated basis was a pretext for retaliation rather than the end of an eight-month impasse.

### 4.6 Funderburk's remaining claims under state and municipal law fail as a matter of law.

The amended complaint cites RCW 49.52, RCW 49.48, RCW 49.17, SMC 14.04, and SMC 14.20 without elaboration. Dkt. No. 5 at 3. Bailey-Boushay reads those citations as tied to the discrimination and WISHA claims already addressed and to a claim for wages during the administrative leave, Dkt. No. 47 at 16 n.8, and Funderburk defends only the wage claim, Dkt. No. 49 at 23. The Court addresses that claim.

Funderburk did no work during the leave, so any right to pay must rest on a promise, and both sides locate it in Edenholm's February 5 email when she wrote, "You're currently on *paid administrative* leave *while* we work out the process for you returning to work." Dkt. No. 49-21 at 2 (emphasis added). Under Washington law, a condition precedent is an event that must occur before a right to immediate performance. *See U.S. Bank Nat'l Ass'n as Tr. for Truman 2016 SC6 Title Tr. v. Rooslid*, 487 P.3d 212, 218 (Wash. Ct. App. 2021). "Words such as 'provided that,' 'on condition,' 'when,' 'so that,' 'while,' 'as soon as,' and 'after' suggest a conditional intent, not a promise." *Id.* (citation modified).

The email promised pay for the defined purpose of "work[ing] out" Funderburk's return to work, a process that required their participation. Funderburk did not complete the forms, disclaimed any disability-based request, set conditions on meeting, and then asked to pause discussions altogether. *See supra* § 2.3. The condition was not met. Funderburk answers that either there was no contract, and so no condition, or there was one and Bailey-Boushay breached it. Dkt. No. 49 at 23. The first proposition leaves Funderburk with no source for the wages they claim, and the second ignores the condition.

Because the only promise of pay was conditional and the condition went unmet, no wages were owed, and the wage claim fails along with the rest.

## 5. CONCLUSION

In sum, the Court ORDERS as follows:

1. Bailey-Boushay's motion for summary judgment, Dkt. No. 47, is GRANTED. Funderburk's claims are DISMISSED with prejudice.
2. Bailey-Boushay's motion to dismiss, Dkt. No. 30, is DENIED as moot. Because the Court resolves Funderburk's claims on the summary-judgment record, their alternative request for leave to amend, Dkt. No. 42 at 32, is also DENIED as moot.
3. The Clerk is DIRECTED to enter judgment and close this case.

Dated this 30th day of October, 2026.

Jamal N. Whitehead
United States District Judge